UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATOYA DEANN JOHNSON, | No. C-12-05291 DMR |
| Plaintiff(s), | **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT IN PART AND REMANDING FOR FURTHER PROCEEDINGS** |
| v. | |
| MICHAEL J. ASTRUE, | |
| Defendant(s). | |

Pursuant to 42 U.S.C. § 405(g), Plaintiff Latoya Deann Johnson ("Plaintiff") seeks review of her application for Supplemental Security Income ("SSI") disability benefits and disability insurance benefits. Defendant Social Security Commissioner ("Defendant" or "Commissioner") denied her application after determining that Plaintiff was not disabled under Titles II and XIV of the Social Security Act, 42 U.S.C. §§ 401 and 1381 *et seq*. Plaintiff now requests judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Both parties filed motions for summary judgment. For the reasons stated below, the court grants Defendant's motion for summary judgment in part and remands this action to the Commissioner for further proceedings.

## I. Procedural History

On November 25, 2008, Plaintiff filed an application for SSI benefits under Title XVI of the Act, and an application for a period of disability and disability insurance benefits under Title II of the Act, alleging disability beginning November 8, 2008. Administrative Record ("A.R.") 201-11.

The agency denied Plaintiff's claim on March 18, 2009, and subsequently denied it again upon reconsideration on June 10, 2009. A.R. 87-94, 95-101. On October 27, 2010, Administrative Law Judge (ALJ) Homer T. Ball, Jr. held a hearing at which two medical experts were scheduled to testify: (1) Reuben Beezy, an internal medicine doctor, and (2) Irwin Shapiro, a psychiatrist. A.R. 128-31. ALJ Ball adjourned the hearing to provide Plaintiff's counsel with additional time to obtain certain records. A.R. 41.

On March 8, 2011, a hearing was held before ALJ Timothy G. Stueve, to whom the matter had been transferred. A.R. 43-82. ALJ Stueve did not schedule any medical experts to testify. Plaintiff was represented by an attorney. Plaintiff testified, as did Plaintiff's aunt, Cynthia Fowler, and a vocational expert. A.R. 43-82. On March 18, 2011, ALJ Stueve issued a written decision finding that Plaintiff had severe impairments consisting of seizure disorder, chronic brain syndrome, and depression, but determining that Plaintiff was not disabled because she could perform a significant number of jobs given her residual functional capacity ("RFC") for a reduced range of work at all exertional levels. A.R. 15-21. The Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the Commissioner's final decision. A.R. 1-9. Plaintiff then filed this action.

## II. Factual Background

**A. Background**

The record contains the following information. Plaintiff was born in 1981. A.R. 201. Plaintiff was first sexually abused when she was seven years old. A.R. 649. Plaintiff began experiencing psychiatric symptoms when she was eleven years old. A.R. 658. She left her childhood home at the age of sixteen and became homeless. A.R. 649. Plaintiff has a history of drug abuse. A.R. 345. She has used marijuana, crack, and methamphetamine. A.R. 650. She graduated from high school and Berkeley Adult School. A.R. 48.

Plaintiff alleges a disability onset date of November 5, 2008. On that date, Plaintiff was pregnant with twins and went into labor at Alta Bates Medical Center. A.R. 345. She experienced a seizure "likely related to potential substance withdrawal" and stopped breathing. A.R. 345-46. She was without a pulse for approximately 15 minutes, and as a result suffered "severe anoxic brain

damage." A.R. 345, 355. Following this event, Plaintiff lapsed into a coma. A.R. 350. She subsequently experienced respiratory failure, and a surgeon performed a tracheostomy upon her. A.R. 353-355. Plaintiff was discharged from Alta Bates Medical Center on November 26, 2008 and transferred to Fairmont Hospital/Alameda County Medical Center for rehabilitation. A.R. 356-357, 436.

Plaintiff's twins were born premature and found to have a toxic exposure to cocaine. They were removed from Plaintiff's custody by Child Protective Services and placed in Ms. Fowler's home. A.R. 74-76, 501, 685. On December 18, 2008, Plaintiff enrolled in a residential drug rehabilitation program called Healthy Babies Project, Inc. A.R. 663. The program required Plaintiff to attend classes from the morning until 5 p.m., after which time the participants did chores in the residential facility. A.R. 61-62. Plaintiff did not have problems while she was living there and did not have difficulty getting along with other residents. A.R. 62. After 90 days in the program, Plaintiff was permitted to occasionally leave the residential facility, but someone from the program would have to accompany her if she did so. A.R. 63. By the time Plaintiff graduated from the program, she was one of the people who would accompany others when they went out. A.R. 63. Plaintiff graduated from the program on December 18, 2009. A.R. 663. The program required that Plaintiff submit to monthly drug testing. All of Plaintiff's tests were negative for drug use. A.R. 665, 670.

As of the date of the hearing before ALJ Stueve, Plaintiff was living in an apartment with a friend. A.R. 48. Plaintiff had no other friends, but she walked to Ms. Fowler's house and saw her and Plaintiff's children[1] every day. A.R. 56-57. In a typical day, Plaintiff would wake around 10 or 11 a.m., although some days she did not get out of bed. A.R. 57. Plaintiff did some chores, watched television, and spent time with her children. A.R. 57-58. Plaintiff was able to do laundry, wash the dishes, and shop monthly for baby clothes. A.R. 242-43. Twice a week, Plaintiff rode the bus to attend Narcotics Anonymous meetings. A.R. 59. Plaintiff took the bus to attend college classes at Merritt College for an hour and a half on three days of the week, and had disability accommodations

---

[1] Plaintiff's children were being monitored by Child Protective Services and were under the care of her aunt. A.R. 59.

at her school. A.R. 49-50, 58, 182. Plaintiff attended church regularly. A.R. 244. Plaintiff stated she was able to get along with authority figures and could handle changes in routine. A.R. 246. Plaintiff had noted on her SSI disability benefits and disability insurance benefits applications that she enjoyed crossword puzzles, but stated at the hearing that she had not done crossword puzzles in a while. A.R. 60. Plaintiff enjoyed word search games. A.R. 61. Plaintiff had a history of drug abuse, but had been clean and sober for two years at the time of the hearing. A.R. 61.

Plaintiff testified that she has a hard time remembering and understanding things. A.R. 54. She stated that if she were to watch a movie, she would not understand what was happening in the movie by its end. A.R. 68. She took medication to control her seizures, high blood pressure, and depression. A.R. 54. Plaintiff stated that she had experienced suicidal ideation in the past, but that the last time she thought about killing herself was when she was a teenager, and she has not acted on those thoughts. A.R. 71, 653, 683. Plaintiff did not believe she could work or take care of her children by herself. A.R. 72.

Regarding her prior work history, Plaintiff testified that in 2000, she worked at Chuck E. Cheese in Houston, and in 2003, she worked at a bagel store in Pacific Palisades. A.R. 51-52. Her records indicated that she worked in 2005 and 2006 as a security guard. A.R. 51-52, 230-31.

Ms. Fowler also testified at the hearing and provided a third party function report. A.R. 73-77, 248-256. Ms. Fowler stated that Plaintiff had come to live with Ms. Fowler in Salinas, had gone to school there, and had been the valedictorian of one of the schools she attended. A.R. 73. Ms. Fowler testified that after Plaintiff's medical incident in November 2008, Plaintiff lost her ability to comprehend instructions. For example, Ms. Fowler testified that Plaintiff could not understand an instruction to get milk from the refrigerator. A.R. 74-75. Ms. Fowler stated that Plaintiff was unable to take care of her children, and that Plaintiff was confused and forgetful. A.R. 74-75, 252. Ms. Fowler testified, "If I send [Plaintiff] into the restroom to get me a Q-Tip or something, she'll go in the restroom, but by the time she is on her way back, she didn't bring what I asked her to bring." A.R. 76.

**B. Plaintiff's Relevant Medical History**

    **i. Dr. Rahman**

4

On February 18, 2009, while Plaintiff was still enrolled in the Healthy Babies Project, Plaintiff had a psychiatric consultative evaluation with Dr. Arifa Rahman, M.D. A.R. 510-51. Plaintiff reported a history of cocaine use for two years, past marijuana use, and drug use during her pregnancy in 2008. A.R. 510. Plaintiff reported that she suffered from memory problems since her post-pregnancy coma, had been depressed "all her life," had trouble sleeping and concentrating, and had a poor appetite. A.R. 511. Plaintiff stated that she was able to take care of herself by going to the grocery store and paying with food stamps, and doing other activities with the assistance of the program director and the other clients in her residential program. A.R. 512. Dr. Rahman noted that Plaintiff was "a very pleasant person who came in on time." A.R. 512. Dr. Rahman also noted that Plaintiff's thought processes were linear and coherent, but that Plaintiff was slow at times and needed repetition. A.R. 512. Plaintiff's thought content was appropriate, and she did not report suicidal or homicidal ideation, though she reported that at times she saw the face of a boyfriend who was murdered in 2007. A.R. 512. Dr. Rahman diagnosed Plaintiff with polysubstance dependence and depressive disorder due to polysubstance dependence, as well as "possibly brain damage due to seizures which may be due to withdrawal of drugs." A.R. 512. Dr. Rahman found Plaintiff's immediate memory recall to be mildly impaired, but found Plaintiff's concentration to be normal. A.R. 513. Dr. Rahman noted that Plaintiff would likely have difficulty performing detailed complex tasks, mild difficulty in simple repetitive tasks and moderate difficulty dealing with usual job stressors encountered at competitive work. A.R. 513. Dr. Rahman found that Plaintiff may have difficulty following directions or instructions from supervisors and also interactions with coworkers. A.R. 513.

### ii. Dr. Balt

The administrative record shows that Dr. Steven Balt at Schuman-Liles Clinic treated and evaluated Plaintiff several times, once while she was still enrolled in the Healthy Babies Project and once afterward. On October 19, 2009, Dr. Balt conducted a psychiatric medication evaluation and noted that Plaintiff reported symptoms of anxiety, decreased concentration, occasional suicidal ideation, poor memory, and anhedonia. A.R. 678. Dr. Balt's check-the-box style notes indicate that Plaintiff's appearance and behavior, mood/affect, thought process, thought content, memory,

attention, concentration, insight, and judgment were all within normal limits. A.R. 680. Dr. Balt diagnosed Plaintiff as having major depressive disorder and seizure disorder due to anoxic brain injury, and prescribed Prozac and Lamictal. A.R. 672-73.

The record also contains a psychiatric medication progress note from Dr. Balt dated April 15, 2010. A.R. 674. Plaintiff reported that some days she got more depressed than normal, but Dr. Balt noted that Plaintiff evidenced "no clear dysfunction." A.R. 674. Dr. Balt found the results of Plaintiff's mental status exam to be within normal limits, and he discontinued Plaintiff's Lamictal prescription. A.R. 674-75. His treatment notes also indicate "296.3 [major depressive disorder], 309.81 [post-traumatic stress disorder] r/o malingering." A.R. 675.

### iii. Dr. Matthis

The record contains notes from Dr. Inecir Matthis, a "Community Mental Health Counselor"[2] at Passion Ministries Inc. who saw Plaintiff between January 6, 2010 and June 28, 2010. A.R. 630-646. Dr. Matthis found that Plaintiff was experiencing depression and anxiety, and diagnosed Plaintiff as having bipolar disorder. A.R. 630, 646. Plaintiff's symptoms included depressed mood, restlessness, low self-esteem, and feelings of guilt. A.R. 630-646.

### iv. Dr. Thomsen

On June 21, 2010, at the request of Plaintiff's counsel, Dr. Ede Thomsen, Ph.D., a licensed psychologist, conducted a psychological examination of Plaintiff which included a battery of tests as well as a patient interview. A.R. 647-661. Dr. Thomsen diagnosed Plaintiff as having (1) major depressive disorder, (2) posttraumatic stress disorder ("PTSD"), (3) generalized anxiety disorder, (4) dementia due to head trauma, (5) polysubstance dependence in sustained full remission, (6)

---

[2] It is not clear from the record in which specialty area Dr. Matthis received a doctorate. Plaintiff notes that Dr. Matthis is not a psychologist or psychiatrist, but urges the court treat her opinion as that of an "other non-medical source," pursuant to SSR 06-03p, 2006 WL 2329939. *See* SSR 06-03p ("In addition to evidence from 'acceptable medical sources,' we may use evidence from 'other sources,' as defined in 20 CFR 404.1513(d) and 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function . . . Information from these 'other sources' cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an 'acceptable medical source' for this purpose. However, information from such 'other sources' may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."). Defendant has not objected to the characterization of Dr. Matthis as an "other source."

schizotypal personality disorder, and (7) personality disorder NOS. A.R. 658. Dr. Thomsen found that Plaintiff's "mental illnesses are debilitating for [Plaintiff's] daily functioning" and concluded that Plaintiff had "a severe deficit in concentration/attention/pace/persistence, memory functioning, executive functioning, [ ] visuospatial abilities," judgment/insight, and social functioning. A.R. 657-58, 661. Dr. Thomsen found that Plaintiff had "severe psychological symptoms," that "interfere with her ability to make decisions, resolve problems, and effectively manage her daily affairs." A.R. 657. Plaintiff "isolates because of her psychological conditions," which Dr. Thomsen noted could created difficulties in work environments that would require Plaintiff to interact with coworkers or supervisors. A.R. 658. Dr. Thomsen found that Plaintiff's "social alienation and isolation would make working effectively with others extremely difficult." A.R. 658. She concluded that Plaintiff had a poor ability to understand, remember, and carry out simple and complex instructions, maintain concentration, attention, and persistence, perform activities within a schedule and maintain regular attendance, complete a normal workday and workweek without interruptions from psychologically based symptoms, and respond appropriately to changes in a work setting. A.R. 661. Dr. Thomsen's report states that "valid results, such as those obtained by Ms. Johnson, indicate that client is not malingering." A.R. 654.

    **v. Dr. Taylor[3]**

In July 2009, prior to the hearings, and one year prior to Dr. Thomsen's evaluation, Alameda County referred Plaintiff for a psychological evaluation with Dr. Warren T. Taylor, Ph.D., a licensed psychologist. A.R. 681-692. Dr. Taylor administered a battery of tests as well as conducted a patient interview. Dr. Taylor reported that his diagnostic impressions of Plaintiff included (1) PTSD, (2) major depressive disorder, (3) dysthymic disorder, (4) cognitive disorder, and (5) polysubstance dependence with sustained partial remission. A.R. 690. Dr. Taylor found that Plaintiff's test results, history, and mental status examination indicate that she does have severe psychopathology that precludes an effective and consistent work effort. A.R. 691. He found that

---

[3] Dr. Taylor's report was apparently not considered by ALJ Stueve, but was submitted by Plaintiff to the Appeals Council. A.R. 22-26. The effect of these circumstances will be discussed further below.

7

she had a fair ability to understand and remember routine and complex instructions, but that she would have extreme difficulty carrying out both routine and complex instructions on a consistent basis because of her severe psychopathology and extremely low energy. A.R. 691. Dr. Taylor stated that Plaintiff would also have extreme difficulty maintaining persistence and consistency, completing a normal workday and workweek without interruptions from psychologically based symptoms, and responding appropriately to changes in the work setting. A.R. 691. He found that her abilities to make simple work-related decisions and act in a timely or effective manner were significantly impaired. A.R. 691. Dr. Taylor noted that "Plaintiff was extremely anxious and tense, presented as extremely tired and appeared to be doing her best." A.R. 686.

### vi. Dr. Morando

State agency medical consultant Dr. Mario Morando, M.D., completed a psychiatric review technique form and a mental RFC assessment for Plaintiff on March 13, 2009. A.R. 516-529. Dr. Morando determined that Plaintiff had organic brain syndrome due to cerebral anoxia or drugs, an affective disorder, and drug dependence. A.R. 517, 519, 522. Dr. Morando found these impairments to be severe but not expected to last 12 months. A.R. 516. Dr. Morando found the following "B criteria" limitations[4]: (1) mild restriction of activities of daily living; (2) moderate difficulty in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence, or pace; and (4) insufficient evidence to determine whether Plaintiff had repeated episodes of decompensation, each of extended duration. A.R. 524. In his mental RFC assessment, Dr. Morando found that Plaintiff's abilities were not significantly limited in any category, and noted that "with continue[d] treatment, the claimant is expected to improve to non-severe by 11/09." A.R. 529.

### III. The Five-Step Sequential Evaluation Process

---

[4] "B criteria" refer to certain functional limitations that a claimant must demonstrate in order to show that her impairment meets or equals one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1, which is Step Three of the five-step sequential evaluation process and is described in greater detail below. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06(B); 20 C.F.R. §§ 404.1520, 416.920.

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[5] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater,* 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel,* 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R. §§ 404.1520, 416.920. The steps are as follows:

1. At the first step, the ALJ considers the claimant's work activity, if any. If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2. At the second step, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled

3. At the third step, the ALJ also considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4. At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work. If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5. At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work. If

---

[5] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett,* 180 F.3d at 1098-99.

### IV. The March 18, 2011 Decision By ALJ Stueve

In the March 18, 2011 decision, ALJ Stueve applied the five-step sequential evaluation to determine whether Plaintiff was disabled. A.R. 10-26. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 5, 2008. A.R. 15. At Step Two, the ALJ found that Plaintiff had the following severe impairments: seizure disorder, chronic brain syndrome, and depression. A.R. 15. At Step Three, the ALJ found that Plaintiff's impairment did not meet or equal a presumptively disabling impairment in the Listings. A.R. 16. At Step Four, the ALJ found that Plaintiff was "unable to perform any past relevant work." A.R. 20. At Step Five, the ALJ determined that Plaintiff was not disabled because there were a significant number of jobs in the national economy that Plaintiff could perform, considering her age, education, work experience, and RFC. A.R. 20-22.

### V. Issues Presented

Plaintiff contends that ALJ Stueve erred at Steps Three and Four of the sequential evaluation process. Specifically, the court will consider the following issues:

1. Whether the ALJ erred in determining that Plaintiff does not meet a listing;
2. Whether the ALJ erred in determining Plaintiff's RFC, including by improperly weighing the medical evidence and rejecting Plaintiff and her aunt's testimony; and
3. Whether the ALJ abused his discretion in failing to schedule medical experts for the adjourned hearing.

### VI. Standard of Review

The ALJ's underlying determination "will be disturbed only if it is not supported by substantial evidence or it is based on legal error." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (internal quotation marks omitted). "Substantial evidence" is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v.*

1  *Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" but less than a preponderance.
2  *Id*. If the evidence reasonably could support two conclusions, the court "may not substitute its
3  judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d
4  1064, 1066 (9th Cir. 1997) (citation omitted). The ALJ is responsible for determining credibility
5  and resolving conflicts in medical testimony, resolving ambiguities, and drawing inferences
6  logically flowing from the evidence. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984); *Sample v.
7  Schweiker*, 694 F.2d 639, 642 (9th Cir.1982); *Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393,
8  1394-95 (9th Cir. 1984). "Finally, the court will not reverse an ALJ's decision for harmless error,
9  which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate
10 nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations
11 and internal quotation marks omitted).

## VII. Discussion

### A. The ALJ's Step Three Analysis of the "B Criteria"

Plaintiff contends that the ALJ erred in finding that Plaintiff's conditions did not meet or equal a listing because they did not satisfy the "B criteria." Namely, Plaintiff contends that the medical evidence supports the conclusion that Plaintiff had marked impairments in social functioning as well as in concentration, persistence, or pace.

At the third step of the sequential evaluation, the ALJ considers the medical severity of the claimant's impairment(s). If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled. To evaluate disabilities based on mental illness, the agency considers documentation of medically determined impairments, the degree of limitations such impairments cause in the applicant's ability to work, and whether the limitations have lasted or can be expected to last for at least twelve months. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00A. Mental impairments may be evaluated under any one of nine separate categories. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.01. ALJ Stueve evaluated Plaintiff using 20 C.F.R., Pt. 404, Subpt. P, App. 1, §12.02, which addresses organic mental disorders, and §12.04, which addresses affective disorders. Both sections 12.02 and 12.04 first provide an introductory statement characterizing the nature of

the impairment, and Subpart A sets forth the criteria supporting the specific medical diagnosis. 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 12.02A, 12.04A.

Section 12.02A requires "medically documented findings" of at least one of several enumerated symptoms, including "disorientation to time and place; or memory impairment . . . [or] thinking disturbances . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.02A. Section 12.04A requires "medically documented findings" of at least one of several enumerated symptoms, including anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation, decreased energy, feelings of guilt or worthlessness, or thoughts of suicide. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04A. ALJ Stueve appears to have accepted, without discussion, that Plaintiff satisfied the requirements of Sections 12.02A and 12.04A. This finding is supported by substantial record evidence, which documents Plaintiff's memory impairment, thinking disturbances, anhedonia, decreased energy, and suicidal ideations.

Upon finding the presence of the enumerated symptomology, the ALJ was then required to consider whether Plaintiff's mental impairments meet at least two of the four so-called "B criteria": (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.02, 12.04; *see also* 20 C.F.R. § 1520a; 20 C.F.R. § 416.920(a)(4)(iii). ALJ Stueve determined that Plaintiff had the following limitations:

> In activities of daily living, the claimant has *mild restriction* based on her testimony that she is able to attend college on a regular basis, taking two classes Monday through Wednesday.
>
> In social functioning, the claimant has *mild difficulties* based on her testimony that she lives with a roommate and visits with her family daily.
>
> With regard to concentration, persistence or pace, the claimant has *moderate difficulties* based on her testimony [about] her ability to take public transportation to go to meetings and school. The representative argued that there has been a cognitive decline based on her "A" grades at Berkeley adult school. However, the claimant testified that despite absences she is getting Cs in her college courses . . . .
>
> These limitations are additionally supported by the claimant's admissions in the December 2008 Function Report, wherein she stated that she has no difficulties with personal care, is able to use a computer to perform search[es] for jobs, perform house work such as laundry and washing dishes, shop for baby clothes [once] per month, attend church regularly, and handle money.

A.R. 16. (emphasis added).

Plaintiff argues that the ALJ erred by not relying on any *medical* evidence in finding that Plaintiff only had a mild impairment in her social functioning. However, Plaintiff points to nothing in the regulation and no cases requiring the ALJ to rely on medical evidence. The evidence in the record demonstrates that Plaintiff was able to interact with people, e.g., with her aunt, roommate, attendees at Narcotics Anonymous meetings, her classmates at her school, with storekeepers and clerks while on shopping trips, and with other members of her church. A reasonable mind could conclude, based on the record, that Plaintiff was only mildly restricted in her social functioning. ALJ Stueve's determination that Plaintiff's conditions caused "mild" restrictions on her social functioning was thus supported by substantial evidence.[6]

**B. Determination of Plaintiff's RFC**

The ALJ determined that Plaintiff "has the residual functional capacity to perform a full range of work at all exertional levels, but [that Plaintiff] can never climb ladders, ropes, or scaffold and must avoid exposure to workplace hazards such as unprotected heights and moving machinery. Mentally, she is able to perform simple, routine, and repetitive tasks, involving only simple work-related decisions, with few if any workplace changes." A.R. 17. Plaintiff argues that the ALJ erred in weighing the medical evidence and in disregarding the testimony of Plaintiff and her aunt concerning the intensity, persistence, and limiting effects of Plaintiff's symptoms.

### i) Evaluation of the Medical Evidence

When reviewing an ALJ's medical opinion determinations, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians"); and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("nonexamining physicians"). *See Lester*, 81

---

[6] As discussed further below, the court does not reach the question of whether the ALJ erred in determining that Plaintiff only had "moderate" difficulties in maintaining concentration, persistence, or pace, because it is remanding the case to the ALJ for consideration of Dr. Taylor's report. However, as Dr. Taylor's findings do not suggest that Plaintiff would have more than "mild" restrictions in her social functioning, Plaintiff's mental impairments cannot meet at least two of the four "B criteria," and the ALJ did not err in finding that Plaintiff's impairments do not meet or equal a presumptively disabling impairment in the Listings in step three of the sequential evaluation.

F.3d at 830. A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a nonexamining physician's opinion. *Id.*

The ALJ is entitled to resolve conflicts in the medical evidence. *Sprague v. Bowen,* 812 F.2d 1226, 1230 (9th Cir. 1987). However, to reject the opinion of an uncontradicted treating or examining physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see also* § 416.927(d)(2); SSR 96-2p, 1996 WL 374186. If another doctor contradicts a treating or examining physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating or examining physician's opinion. *Lester*, 81 F.3d at 830-31. The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725. A nonexamining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990), though it may be persuasive when supported by other factors. *See Tonapetyan*, 242 F.3d at 1149; *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant). An opinion more consistent with the record as a whole generally carries more persuasiveness. *See* §416.927(d)(4).

### ii) Substantial Evidence Does Not Support the ALJ's RFC Determination

ALJ Stueve accorded "no weight to the evaluation of Dr. Thomsen." A.R. 19. In order to reject the testimony of an examining physician whose opinions are contradicted by evidence from other treating or examining physicians, the ALJ must provide "specific and legitimate" reasons supported by substantial evidence. *Lester*, 81 F.3d at 830-31.

The ALJ noted that Dr. Thomsen's "conclusions appear extreme and are not consistent with limited treatment records from [Dr. Balt] and [Dr. Matthis] . . . . [and] weakened by the claimant's demonstrated ability to attend college, use public transportation, live in a communal setting, visit her family daily, shop, perform household chores, handle money, and use public transportation." A.R. 19. Drs. Balt and Matthis, two treating physicians, found that Plaintiff's mental status

characteristics were within normal limits. A.R. 674-75, 630-646; *see also* A.R. 18-19 (ALJ noting that Dr. Balt found that Plaintiff's mental status examination characteristics were within normal limits and that Dr. Matthis's mental status examinations did not reveal significant findings and described few psychological symptoms).

In contrast, Dr. Thomsen's conclusions painted a very different portrait of Plaintiff's abilities: Dr. Thomsen found that Plaintiff had "severe psychological symptoms" that "interfere with her ability to make decisions, resolve problems, and effectively manage her daily affairs." A.R. 657. Dr. Thomsen also found that Plaintiff had a "severe deficit" in concentration, persistence, and pace; poor ability to understand, remember, and carry out simple and complex instructions; poor ability to complete a normal workday or workweek without interruptions from psychologically-based symptoms and respond appropriately to changes in a work setting; poor ability to perform on a schedule and maintain regular attendance; and that Plaintiff experienced severe depression. A.R. 650-58.

Plaintiff contends that Dr. Thomsen's findings are corroborated by the findings of Dr. Taylor, a psychologist who examined Plaintiff upon the referral of Alameda County. A.R. 682. As noted above, Dr. Taylor's report was not part of the evidence presented to the ALJ and was therefore not considered by the ALJ in his determination of Plaintiff's disability. In Social Security cases, the ALJ has a special duty to develop the record fully and fairly and to ensure that the claimant's interests are considered, even when the claimant is represented by counsel. *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001); *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir.1983). The regulations provide that the ALJ may attempt to obtain additional evidence when the evidence as a whole is insufficient to make a disability determination, or if after weighing the evidence the ALJ cannot make a disability determination. 20 C.F.R. § 404.1527(c)(3); *see also* 20 C.F.R. 404.1519a. Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to "conduct an appropriate inquiry." *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996); *Armstrong v. Comm'r of Soc. Sec. Admin.,* 160 F.3d 587, 590 (9th Cir.1998). An ALJ may discharge his duty to develop the record in several ways, including: subpoenaing the plaintiff's physician, submitting questions to the physician, continuing

the hearing, or keeping the record open after the hearing to allow supplementation of the record. *Tonapetyan,* 242 F.3d at 1150 (citations omitted).

Plaintiff claims that she disclosed Dr. Taylor's report to the agency when requesting reconsideration, and that the disability evaluation analyst assigned to her claim did not make efforts to obtain the report. Motion for Summ. J. at 9 n. 2. However, this claim is contradicted by the fact that in her request for reconsideration dated March 25, 2009, Plaintiff indicated that she did not have additional evidence to submit. A.R. 92. Similarly, in her request for a hearing by an ALJ dated July 24, 2009, Plaintiff also indicated that she did not have additional evidence to submit. A.R. 100. Plaintiff *did* indicate in a disability report she submitted at some point before July 27, 2009 that she had visited Dr. Taylor in July 2009 for a complete psychological evaluation. A.R. 24, 312. However, a subsequent question on the form asks Plaintiff if anyone else had medical records or information about her condition since she last completed a disability report. A.R. 313. Plaintiff responded, "No." A.R. 313. In the notices informing her of the hearings before ALJ Ball and ALJ Stueve, Plaintiff was informed that she should submit evidence as soon as possible or bring it to the hearing, and that she would be able to review her administrative file before the date of her hearings upon request. A.R. 120, 160-61. Plaintiff did not submit Dr. Taylor's report to the ALJ or bring it to the hearing. Under these circumstances, this court cannot hold that ALJ Stueve erred by not procuring Dr. Taylor's report prior to the hearing.

Even so, this court must consider Dr. Taylor's report when reviewing Defendant's final decision for substantial evidence. "[W]hen a claimant submits evidence for the first time to the Appeals Council, which considers that evidence in denying review of the ALJ's decision, the new evidence is part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence." *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1159-60 (9th Cir. 2012). The Ninth Circuit has explained why evidence not considered by the ALJ but accepted by the Appeals Council must be considered part of the administrative record:

> The Commissioner's regulations permit claimants to submit new and material evidence to the Appeals Council and require the Council to consider that evidence in determining whether to review the ALJ's decision, so long as the evidence relates to the period on or before the ALJ's

decision. *See* 20 C.F.R. § 404.970(b).3  Claimants need not show "good cause" before submitting new evidence to the Appeals Council. *See id.* . . . Because the regulations require the Appeals Council to review the new evidence, this new evidence must be treated as part of the administrative record. [¶] In addition, the Commissioner's decision is not final until the Appeals Council denies review or, if it accepts a case for review, issues its own findings on the merits. See 20 C.F.R. §§ 404.955, 404.981 . . . . Thus, as a practical matter, the final decision of the Commissioner includes the Appeals Council's denial of review, and the additional evidence considered by that body is "evidence upon which the findings and decision complained of are based." 42 U.S.C. § 405(g).

*Id.* at 1162 (case citations omitted).  Here, Dr. Taylor's report was accepted as evidence by the Appeals Council, who nonetheless denied Plaintiff's request for review, and thus this court must consider it part of the administrative record as a whole.  A.R. 1-2.

Like Dr. Thomsen, Dr. Taylor found that Plaintiff would have "extreme difficulty maintaining persistence and consistency," "extreme difficulty carrying out both routine and complex instructions on a consistent basis because of her severe psychopathology," "extreme difficult[y]" in completing a normal workday or workweek without interruptions from psychologically-based symptoms and responding appropriately to changes in a work setting; and that Plaintiff's ability to make simple work-related decisions and act in a timely or effective manner were significantly impaired and she experienced severe depression. A.R. 691.  The ALJ justified his decision to give no weight to Dr. Thomsen's findings because he believed they were "extreme and [] not consistent with limited treatment records."  However, Dr. Thomsen's findings are supported by the findings of Dr. Taylor, who acted as *the agency's* consultative examiner, and thus the ALJ has not articulated specific and legitimate reasons supported by substantial evidence for rejecting Dr. Thomsen's findings.  This case is therefore remanded to the ALJ for reconsideration of the record as a whole, which includes the report of Dr. Taylor.[7]

---

[7] Since the matter is remanded for further proceedings with instructions to the ALJ to evaluate the disability claim based on the entire medical record, the court does not reach the questions of whether the ALJ erred (1) in giving great weight to the report of Dr. Rahman, (2) in determining that Plaintiff had only "moderate" difficulties in maintaining concentration, persistence, or pace, and (3) in discrediting Plaintiff and Ms. Fowler's testimony, as the analyses for all of these questions may be affected by the ALJ's consideration of Dr. Taylor's report. The court notes that the ALJ discounted Plaintiff's credibility in part because of Dr. Bolt's suspicion of possible malingering. A.R. 19. Dr. Bolt's records indicate a working diagnosis of major depressive disorder and post-traumatic stress disorder, rule out malingering.  A.R. 675.  However, both Dr. Thomsen and Dr. Taylor, who both administered batteries of psychological tests, opined that Plaintiff "put forth best effort" and that her valid results on the MCMI-III indicate Plaintiff is not malingering.  A.R. 686, 654.

### C. Lack of Medical Experts at Hearing

Plaintiff contends that ALJ Stueve abused his discretion by failing to schedule medical experts for the adjourned hearing. Plaintiff argues that ALJ Ball's request for a medical expert to testify at the original hearing, which was adjourned to permit Plaintiff time to gather medical records, created a right for her to question a medical expert at the hearing before ALJ Stueve. Alternatively, Plaintiff argues that ALJ Stueve erred by not providing "a ruling on any objection[8] to his failure to reschedule a medical expert for an adjourned hearing when a medical expert was scheduled for the initial hearing." Mot. Summ. J. at 24.

However, Plaintiff recognizes that an ALJ's decision regarding whether a medical expert is necessary is inherently discretionary. *See* Mot. Summ. J. at 23; *accord* 20 C.F.R. §§ 404.1527(f)(2)(iii), 416.927(f)(2)(iii) (an ALJ "may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s)"); *Kruchek v. Barnhart*, 125 F. App'x 825, 827 (9th Cir. 2005) (noting that the word "may" in 20 C.F.R. § 1527(f)(2)(iii) "indicates that use of [a medical expert] for ... [a disability] determination is permissive, not mandatory"). She further acknowledges that the relief she requests is a question of first impression, and cites to no law, regulation, or ruling to support her position, instead appealing to the court to make decisions based on unexplained broad policy rationales and the public interest. The burden is on the claimant to provide medical and other evidence of medical impairments and their effect on her ability to work. 20 C.F.R §§ 404.1512(a), 416.912(a); *Howard v. Heckler,* 782 F.2d 1484, 1486 (9th Cir. 1986). ALJ Stueve did not find the record inadequate and was therefore under no further duty to develop the record. *See Tonapetyan*, 242 F.3d at 1150 (where the evidence remains ambiguous, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, ALJ's duty to conduct an appropriate inquiry is triggered). Under these circumstances, the court declines to hold that ALJ Stueve abused his discretion by not calling a medical expert to testify at the hearing.

---

[8] Plaintiff has not pointed the court to any objection to ALJ Stueve's failure to schedule a medical expert for the hearing that she actually presented to ALJ Stueve. It is not possible for this court to conclude that ALJ Stueve erred in failing to respond to an objection that was never presented to him.

## VIII. CONCLUSION

For the foregoing reasons, the Court finds the ALJ's decision not fully supported by substantial evidence in the record. Accordingly, the court remands this case to the Commissioner for further proceedings not inconsistent with this opinion.

IT IS SO ORDERED.

Dated: September 19, 2013

DONNA M. RYU
United States Magistrate Judge